**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN ROTHSTEIN, | ) | |
| *Plaintiff,* | **)** | Case No. 2009-cv-2770 |
| vs. | ) | |
| | ) | Judge Kendall |
| AMERICAN AIRLINES, INC., | ) | Magistrate Judge Valdez |
| *Defendant,* | ) | |

**AMERICAN'S RESPONSES TO PLAINTIFF AND COUNTER-DEFENDANT STEVEN
ROTHSTEIN'S LOCAL RULE 56.1(a)(3) STATEMENT
OF MATERIAL FACTS AS TO WHICH THERE IS NO
GENUINE ISSUE, AND STATEMENT OF ADDITIONAL FACTS**

NOW COMES the Defendant, AMERICAN AIRLINES, INC. ("American"), by its

attorneys, Michael G. McQuillen, Mark S. Susina and Austin W. Bartlett of ADLER MURPHY

& McQUILLEN LLP, and as its RESPONSES TO PLAINTIFF AND COUNTER DEFENDANT

STEVEN ROTHTSTEIN'S LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS

AS TO WHICH THERE IS NO GENUINE ISSUE, AND STATEMENT OF ADDITIONAL

FACTS, states as follows:

## MATERIAL FACTS

### THE PARTIES/SUBJECT MATTER JURISDICTION/VENUE

1. Plaintiff/Counter-Defendant Steven A. Rothstein ("Rothstein') is an individual
who now resides in the State of New York. Rothstein was domiciled in the State of Illinois when
this action was commenced. (*Rothstein Declaration* ¶1).

**ANSWER: American admits that Rothstein is an individual who claims to reside in the
state of New York and claims to have been domiciled in the State of Illinois when the action
commenced.**

2.      Defendant/Counter-Claimant American Airlines, Inc. ("American Airlines" or "American') is incorporated in the State of Delaware with its principal place of business in the State of Texas. (American Airlines Answer and Counterclaim)

**ANSWER:     American admits the allegations of Paragraph 2.**

## ROTHSTEIN'S PURCHASE OF AN UNLIMITED MILEAGE LIFETIME AAIRPASS WITH COMPANION FEATURE

3.      In 1987, Rothstein and American Airlines entered into an AAirpass Agreement which, upon payment in full of the price of the AAirpass, *entitled* Rothstein, as "holder" to Unlimited Mileage in any class of service offered by American Airlines, including First Class for Rothstein's *Lifetime*.  (*Rothstein Declaration*, ¶2;  See AAirpass Agreement,  Exhibit 3, paragraph 3 p. 00014; *Thurmond Declaration*, ¶10; *Challender Deposition* Exhibit "A" pp. 34: 20-25; 35:1-2;  38: 10-18; 41: 14-25; 42: 1-5; 45: 21-25; 46: 3-6, p. 46: 15-23; 47; 48: 1-6)  Note: Jerry Challender was designated as American Airlines corporate representative concerning (1) The negotiation of Steven Rothstein's Unlimited Lifetime AAirpass Agreement and (4) the documents relating to the parties' mutual intent with regard to termination rights under Paragraph 17 of the AAirpass agreement (see Exhibit 1 Page 2 of Plaintiff's Notice of FRCP 30(b)(6) corporate depositions of defendant American Airlines, Inc. Challender acknowledged that he is the person most knowledgeable  at American Airlines concerning the mutual intent of the parties regarding the AAirpass Agreement. (*Challender Deposition* Exhibit "A", p 82: 19-23) Excerpts from the *Challender Deposition* are attached to the *Soter Declaration* as Exhibit "A". (*Challender Deposition* Exhibit "A" p. 7:8-12; p. 20:9-17)  American Airlines other corporate representative, Bridget Cade, testified on the remaining seven topics, including Mr. Rothstein's alleged fraudulent use, American Airlines' investigation American Airlines' basis for terminating Rothstein's Unlimited Lifetime AAirpass. (*Cade Deposition* Exhibit "C" p. 14:13-23)  Excerpts from the *Cade Deposition* are attached to the *Soter Declaration* as Exhibit "C".

**ANSWER:     American admits that Rothstein and American entered into an Airpass Agreement in 1987, subject to the terms and conditions set forth therein.  American further admits that Mr. Challender and Ms. Cade were designated to testify in this litigation as American's representative pursuant to F.R.C.P 30(b)(6).**

2

4.      Rothstein paid American Airlines the full purchase price of $250,000 less credit received on his existing unexpired limited mileage, limited term pass, to purchase the Unlimited Mileage Lifetime AAirpass. (*Rothstein Declaration*, ¶2;  Exhibit 3, p: 000010).

**ANSWER:      American admits the allegation of paragraph 4.**

5.      In November, 1989, in consideration of Rothstein's payment of an additional $150,000 to American Airlines, Paragraph 3(c) of the AAirpass Agreement was amended to read as follows:  "Purchaser has agreed to purchase a companion feature to be used in conjunction with an Unlimited Lifetime AAirpass.  This companion feature will allow Holder to make a reservation for and travel on the AAirpass with one (1) companion per flight.  Such companion shall be entitled to receive the same in-flight amenities as provided to Holder."  (*Rothstein Declaration*, ¶3)  Paragraph 11 of the AAirpass allowed Rothstein to reserve two seats per flight if qualified for travel with a companion!! (Exhibit 3, pp. 00006, 00012-00016).

**ANSWER:      American denies the allegations of paragraph 5.  Subparagraph 3(c) was amended to read as follows:**

> **Purchaser has agreed to purchase a companion feature to be used in conjunction with an Unlimited Mileage Lifetime AAirpass.  This companion feature will allow Holder to make a reservation for air travel on the AAirpass with one (1) companion per flight.  Such companion shall be entitled to receive the same in-flight amenities as provided by holder.  If spouse is the companion, the spouse will be allowed to travel separately from Holder, provided that spouse travels on the flight immediately prior to or just after the flight taken by Holder.  It is understood that when spouse travels in this manner, Holder will not be allowed a companion on the same flight as Holder.**

**Ex. C, Complaint Ex. A.  American admits that the AAirpass agreement "entitled Holder [Rothstein] to reserve one seat per flight (two seats per flight if qualified for travel with a companion)."  Ex. C, Complaint Ex. A.**

6.      The AAirpass Agreement and Addendum is a form contract drafted entirely by American Airlines. (*Rothstein Declaration*, ¶4; *Thurmond Declaration*, ¶8).

**ANSWER:      American denies the allegations of Paragraph 6.  American added two terms to the AAirpass Agreement at Mr. Rothstein's request. Ex. D, S. Rothstein Dep., p. 60: 5-14.  One of terms allowed  S. Rothstein's wife to travel on a different flight.  Ex. C, Complaint, Ex. A.  Ex. D, S. Rothstein  Dep., p. 60:5-14; Ex. A, Challender Dep., p. 74:25, 75:1-8.**

3

7. The AAirpass Agreement with companion feature: (a) allows the holder to reserve a companion seat for any person of any age or gender whether or not the companion is related to or previously known by the AAirpass holder; [*Challender Deposition* Exhibit "A" p. 74: 16-25; p. 75:1-6; pp 93-95]; (b) allows the holder to reserve seats for one companion and substitute another immediately before the scheduled flight—the identity of the companion is not a matter of consequence to American Airlines; [*Johnson Deposition*, Exhibit "B" p. 14: 6-17; Exhibit 3; *Challender Deposition*, Exhibit "A" pp 74-76]; (c) allows for companion changes and substitutions on a priority basis (for Platinum Elite customers) without cost or penalty to the AAirpass holder; [*Challender Deposition* Exhibit "A" p. 74: 13-25; 93: 21-25; pp. 94-95:1-4] (d) rewards the AAirpass holder with frequent flier AAdvantage miles credited to the holder's American Airlines AAdvantage account for all flights flown by the holder and his companion; [*Rothstein Declaration*, ¶5; *Thurmond Declaration*, ¶9) (e) does not prohibit, restrict or penalize no shows, cancellations, speculative reservations or inconsistent bookings. [Exhibit 3; *Challender Deposition* Exhibit "A" p. 71: 9-25] (f).

**ANSWER: American Airlines admits that the companion feature "will allow Holder [Rothstein] to make a reservation for and travel on the AAirpass with one (1) companion per flight," and "entitl[ed] holder to take along one accompanying companion of any age per flight." Ex. C, Complaint, Exhibit 1.**

8. The AAirpass Agreement, American Airlines' "Conditions of Carriage", and "tariff rules" at the time of Rothstein's travel did not prohibit or penalize inconsistent, multiple or speculative reservations. (*Challender Deposition* Exhibit "A" p. 72: 21-24; 82: 2-4; Exhibit 3; *Cade Deposition* Vol. 2, pp. 19, 20, 21:3-8, 23:5-18, *Thurmond Declaration* ¶¶12,13).

**ANSWER: American denies that the AAirpass, Conditions of Carriage and Tariff in effect at the time of Rothstein's travel "did not prohibit or penalize inconsistent, multiple or speculative reservations." American viewed speculative reservations as a fraudulent use of the AAirpass and defined speculative reservations as "when [one] make[s] a booking with no anticipation of travel." Ex. F, Cade Dep., Vol. I, p. 66: 6-9, 97: 8-20, 105: 13-19); (Ex. H, Cade Dep., Vol. II, p. 16: 9-18.**

## ROTHSTEIN'S USE OF THE UNLIMITED MILEAGE AAIRPASS

9. Rothstein made all of his AAirpass reservations by telephone, usually through an American Airlines reservations agent who handled reservations for American's most elite, highly prized customers. Occasionally, American Airlines would intentionally double book flights for elite customers to protect their calendars (*Rothstein Declaration*, ¶ 6; Betty *Johnson Deposition* attached to the *Soter Declaration* as Exhibit "B": p. 24: 12-13; *Cade Deposition*, Exhibit "C", p. 32:23-25, p. 33: 1-24).

**ANSWER: American admits that its records indicate that Rothstein made AAirpass reservations through the reservations department. (Ex. F, Cade dep. Vol. I, 33:2-3) American denies that "American would intentionally book double flights for elite customers to protect their calendars." American's SAGE computer system was set up to cancel out duplicate bookings to eliminate spoiled seats. (Ex. J, Johnson Dep., p. 17:12-19.) While the computer system is extremely sophisticated, it nevertheless would allow a customer to make duplicate reservations. Ex. J, Johnson Dep., p. 23:9-13**

10. American Airlines had a computer system ("SAGE") that American used to identify and cancel multiple inconsistent reservations. However, American did not utilize SAGE with its Unlimited Lifetime AAirpass holders. (*Cade Deposition* Exhibit "C" p. 25, p. 26: 1-2)

**ANSWER: American admits that its SAGE computer system would identify and cancel multiple inconsistent reservations, and that at the time of Rothstein's travel, the SAGE computer system inadvertently excluded AAirpass bookings by virtue of the way the reservations were made. Ex. F, Cade Dep., Vol. 1 at p. 26:3-16.**

11. American Airlines agents allowed Rothstein to use his companion feature to reserve, hold and fly next to *empty* first class companion seats from 1987 until 2004 without communicating any objection or complaint to Rothstein. (*Challender Deposition* Exhibit "A" p. 24: 24-25 through p. 26:8; p. 103:8-25; 104:1-22; *Rothstein Declaration*, ¶7).

**ANSWER: American denies paragraph 11 in its entirety. Mr. Challender testified that American did not ever explicitly or expressly allow Rothstein to book an empty seat. Ex. A, Challender Dep. p. 24:24-25; 25:1-5.**

12. In 2004, American Airlines asked Rothstein to stop reserving empty companion seats. (Lisa Welch Deposition attached to the *Soter Declaration* as Exhibit "D", p. 22: 19-21) American *drafted* a warning-notice letter to Rothstein indicating that American would thereafter deem any "speculative reservation" as a "FRAUDULENT USE" entitling American Airlines to

terminate the AAirpass under Paragraph 12, without refund. (Exhibit 19)  American never sent that draft letter or any other letter concerning "speculative reservations" to Rothstein because American was "concerned about bad press" (*Rothstein Declaration*, ¶8; *Challender Deposition* Exhibit "A" pages 88-89;  Exhibit 19)  and American didn't want to take 15 or 20 minutes to put Rothstein on notice of its new unwritten policy concerning "speculative reservations"  or  no shows [*Challender Deposition* Exhibit "A" p. 111: 21-24 through p. 115; pp.  88-90;  p.71: 9-25].

**ANSWER:  American admits only that Lisa Welch advised Rothstein that it was not acceptable for Rothstein to book an empty seat, and that Rothstein agreed to stop the practice.  (Ex. G, Welch Dep. pp. 22:22-25; 23:1-21.)  American admits that it considered writing a letter to Rothstein before terminating the AAirpass Agreement because he engaged in making speculative reservations, which American believes is a fraudulent use of his AAirpass. American decided not to send the letter to Rothstein because it did not want to risk the negative perception that might come from terminating a lifetime AAirpass member.  (Ex. A, Challender Dep., p.88:18-25; 1-9.)  American denies that it "didn't want to take the 15 or 20 minutes to put Rothstein on notice of the new unwritten policy concerning speculative reservations or no shows." American had a demonstrated observation of Mr. Rothstein's fraud that it could have, but chose not to, act upon in 2006. Ex. A, Challender Dep. p. 90:20-21.**

13.    Rothstein stopped reserving empty seats after American Airlines asked him to stop reserving empty seats.  (*Rothstein Declaration*, ¶7; *Challender Deposition* Exhibit "A"  pp. 54: 7-23; 103: 8-25; 104:1-22; Welch Deposition Exhibit "D" p. 23: 17-25).

**ANSWER:  American admits that Rothstein stopped reserving seats in the name of "Steven Rothstein, Jr." after American requested that he stop.**

14.    Rothstein was one of American Airlines' most frequent fliers, accumulating more than 33 million miles into his American Airlines AAdvantage account.(*Challender Deposition* Exhibit "A" p: 70:18-22).

**ANSWER:  American admits that Rothstein was one of American Airlines' most frequent  customers.**

15.    American last offered the Unlimited Mileage Lifetime AAirpass for sale in 2004 via the Christmas book at a price of $3,000,000 *without* the companion feature and $5,000,000 with the companion feature.  (*Challender Deposition* Exhibit "A" p. 28: 3-6, p. 29: 5-25, p. 30:

1-17, p. 32; Exhibit 30) The contemporaneous advertising said that the rules were simple—namely that the holder would be entitled to unlimited mileage on any class of service offered by American Airlines for the remainder of his or her life. There was nothing in the accompanying advertising materials which stated or implied that American Airlines, Inc. intended to reserve the right to terminate the pass. The intent of the Neiman Marcus offer was substantially identical to the American Airlines' agreement with Rothstein—namely to create an agreement whereby the holder would be entitled to lifetime benefits absent fraudulent use. (*Challender Deposition* Exhibit "A" pp. 28-32).

**ANSWER: American admits that American offered a Lifetime AAirpass Membership for sale in 2004 in the Neiman Marcus Christmas catalog. American admits that one Lifetime AAirpass Membership was priced at $3,000,000. American denies that the Membership was offered with a companion feature at any price, and the record is devoid of any evidence indicating as much. American further states that there is no evidentiary basis to support the plaintiff's allegation that "the contemporaneous advertising said that the rules were simple – namely that the holder would be entitled to unlimited mileage on any class of service offered by American Airlines for the remainder of his or her life." American denies that there is any evidentiary basis for the plaintiff's statement that there "is nothing in the accompanying advertising materials which stated or implied that American Airlines, Inc. intended to reserve the right to terminate the pass." American denies that that the Neiman Marcus offer was "substantially identical" to the American Airlines agreement with Rothstein. The agreement changed "in a number of ways" and is "a bit more detailed contract now." (Ex. A, Challender Dep., p. 30:4-10.) There was a "spousal card benefit" that does not exist today. (Ex. A, Challender Dep. at p. 29:13:17.) There have been minor changes in the insurance feature. (Ex. A, Challender Dep. at p. 29:16-18.) American denies plaintiff's allegations that the holder would be entitled to lifetime benefits absent fraudulent use. The Neiman Marcus contract included a paragraph equivalent to the Paragraph 17(c) in the plaintiff's counsel (perhaps renumbered), and a provision setting forth a 200-month term for calculating refunds. (Ex. A, Challender Dep. at p. 30:11-25.)**

16. All of American's Unlimited Lifetime AAirpasses are more than 200 months old. (*Challender Deposition* Exhibit "A" p. 38) American has expressly admitted at deposition that all of the 60 living Lifetime AAirpass holders have a reasonable expectation that they are *entitled* to continuing lifetime benefits and that American cannot terminate Lifetime AAirpasses after 200 months without cause and without refund as alleged in American Airlines' counterclaim and in its unsuccessful Motion to Dismiss. (*Challender Deposition* Exhibit "A" pp. 82, 83, 33, 35, 40-42, 45, 48).

**ANSWER:** **American admits that all of its Unlimited Lifetime AAirpasses are more than 200 months old. American admits that Unlimited Lifetime AAirpass Holders are entitled to use the AAirpass for his or her life, but that American reserved the right to terminate the AAirpass without offering a refund after 200 months. Ex. A, Challender Dep., p. 36:20-25, 37:1-5.**

## THE "INVESTIGATION" BY THE REVENUE MANAGEMENT DEPARTMENT OF AMERICAN AIRLINES

17. American grossly estimated (and later calculated for certain) that Rothstein was costing the airline more than $1,000,000 *per year* from 2003-2008 based on the cost of first class tickets used by Rothstein and his companions. (*Soter Declaration*, ¶5; *Cade Deposition* Exhibit "C" p. 21:2-16 ).

**ANSWER:** **American denies that it "grossly estimated (and later calculated for certain) that Rothstein was costing the airline more than $1,000,000 per year from 2003 to 2008 based upon the cost of the first class tickets used by Rothstein and his companions." American conducted a "very gross in-department estimate" that the company would have saved $1,000,000 annually as a result of terminating Rothstein's contract. (Ex. F, Cade Deposition Vol.1, p. 21:13.) There is no evidentiary basis for plaintiff's allegation that that Rothstein cost the airline more than $1,000,000 per year from 2003 to 2008 based upon the costs of first class tickets used by Rothstein and his companions, other than the improper declaration of Plaintiff's counsel, Gary Soter.**

18. An American Airlines employee in its Revenue Management Department (Bridget Cade) conducted and completed three investigations of AAirpass holders. American's investigator was not trained in investigation techniques and she had no knowledge of the elements of fraud under the law. (*Cade Deposition* Exhibit "C" p. 121: 2-10; Cade Deposition Exhibit "C" Vol. 2 p. 15:3-9, p. 17:20-24, p. 18:13-19).

**ANSWER:** **American admits that Bridget Cade is an employee in its Revenue Management Department. American admits that Ms. Cade is neither a lawyer nor a trained investigator, nor had knowledge of the elements of fraud under Texas law. American admits that Ms. Cade completed three investigations of AAirpass Holders. Ex. F, Cade Dep., Vol. 1, pp. 75:23-25; 76:1; 77:2-3. There is no evidence on the record that Ms. Cade only conducted three investigations.**

19.     Based on Cade's review of American's computer booking records showing flights booked and flown, and without conducting a single interview, American terminated all three Lifetime AAirpasses investigated based on conduct which American deemed to constitute fraudulent use. (*Cade Deposition* Exhibit "C" p. 11:25, p. 12:1-9 p. 22: 25; p. 23: 1-4; p. 65: 2-25) American falsely testified that American had no economic incentive to terminate the passes. (*Cade Deposition* Exhibit "C" p. 103: 20-25).

**ANSWER:     American admits that Ms. Cade reviewed Rothstein's booking and flight records.  American admits that it terminated the AAirpasses of three individual AAirpass Holders.  American denies that it falsely testified that it "had no economic incentive to terminate the passes."  American conducted no analysis of the amount of money that it would save as a result of terminating Mr. Rothstein's AAirpass, and only made a "very gross in-department estimate."     (Ex. F, Cade Dep., Vol. 1, p. 21:1-7.)   There is no evidentiary basis cited in Paragraph 19 that supports Plaintiff's allegation that American did not conduct "a single interview;" thus, American denies the same.  In fact, American did conduct interviews with booked passengers.  Ex. F, Cade Dep., Vol. 1, p. 61: 1-4.**

20.     American never considered the difference between intentional and negligent misconduct. (*Cade Deposition* Exhibit "C" p. 130:10-15; p. 131: 19-23).

**ANSWER:     American denies the allegations of Paragraph 20.  Ms. Cade testified that she did not know.  Ex. F, Cade Dep. Vol. 1, at p. 130: 10-15.**

21.     American determined that Rothstein fraudulently used his AAirpass on ten of the 1800 flights reviewed. (*Cade Deposition* Exhibit "C" p. 60:15-25, *Cade Deposition* Exhibit "C" Vol. 2 p. 85:1-5).

**ANSWER:     American admits that it was able to document at least ten occasions where Mr. Rothstein fraudulently used his AAirpass.**

22.     American did not ask Rothstein or any of his companions about any of the allegedly fraudulent companion reservations made by Rothstein. (*Cade Deposition*, Exhibit "C" pp. 60: 15-25; p. 68: 12-18; p. 131: 19-25; p. 132: 20-25; p. 133; p.134: 1-22).

**ANSWER:     American denies the allegations of Paragraph 22.  American did conduct interviews with booked passengers.  Ex. F, Cade Dep., Vol. 1, p. 61: 1-4.  Additionally, Lisa Welch met with Mr. Rothstein in 2004 and discussed his practice of fraudulently reserving empty seats.  Ex. B, Welch Dep., p. 10:10-20; Ex. A, Challender Dep., p. 103:10-19.**

9

23. American did not communicate or attempt to communicate with any of the American Airlines representatives who negotiated the AAirpass Agreement (to determine contractual intent) or any of the agents who made reservations for Rothstein during the 20 years that he used the AAirpass (to determine whether the companion reservations were made in good faith). (*Cade Deposition* Exhibit "C" p. 60: 15-20, p. 68: 12-18; *Thurmond Declaration*, ¶18).

**ANSWER: American admits that it did not communicate with Mr. Thurmond or any reservations agents regarding any issue in connection with its investigation that resulted in the termination of Rothstein's AAirpass.**

24. American concluded that Rothstein made fraudulent bookings from its perspective without knowing or considering any of the elements of fraud under Texas law. (*Cade Deposition* Exhibit "C" pp. 75, 96, 97).

**ANSWER: American denies the allegations of Paragraph 24. The Plaintiff's Notice of Rule 30(b) (6) Corporate Deposition did not request that American produce a witness to testify on the elements of fraud under Texas law. American admits that Ms. Cade, who is not an attorney, does not know the elements of proving a case for fraud under Texas law. Ex. F, Cade Dep. Vol. 1, at p. 74:23-25; p. 75:1-6; p. 130:10-18.**

**FACTS REVEALED DURING DISCOVERY ABOUT ROTHSTEIN'S ALLEGED FRAUDULENT USE OF THE AAIRPASS WHICH HAVE EITHER BEEN ADMITTED BY AMERICAN AIRLINES OR FOR WHICH THERE IS NO CONTRARY <u>ADMISSIBLE EVIDENCE</u>**

25. American admits that Rothstein never said anything deceptive to American and that Rothstein never deceived any *person* employed or affiliated with American Airlines. (*Cade Deposition* Exhibit "C" p. 79: 10-12; p. 82: 17-25; p. 83: 1-7; *Johnson Deposition* Exhibit "B" p. 8: 19-23, p. 9: 1-11, p. 14: 6-17, p. 18: 12-17,: p. 38: 9-21).

**ANSWER: American denies the allegations of Paragraph 25. Ms. Cade did not know the contents of any conversations between Rothstein and American's reservations agents. (Ex. F, Cade Dep., Vol. 1, p. 79:19-13.) American believes that the company was deceived by Rothstein. (Ex. F, Cade Dep., Vol. 2, p. 82:17-25, 83:1-7.) There is no evidentiary basis in the deposition testimony cited by Plaintiff in Paragraph 25 to support the allegations that "Rothstein never said anything deceptive to American and that Rothstein never deceived any *person* employed or affiliated with American Airlines."**

26. American contends that it has the right to terminate Rothstein's Unlimited Mileage Lifetime AAirpass and forfeit Rothstein's entire $400,000 "investment" for any conduct at any time which American *deems* a fraudulent use even if Rothstein did nothing wrong. (*Cade Deposition* Exhibit "C" pp. 130-131; *American Airlines Answer, and Counterclaim Docket Document* No. 25 at p. 5).

**ANSWER: American denies that it "contends that it has the right to terminate Rothstein's Unlimited Mileage Lifetime AAirpass and forfeit Rothstein's entire $400,000 'investment' for any conduct at any time which American deems a fraudulent use even if Rothstein did nothing wrong." Paragraph 17(c) of the AAirpass Agreement provides that American "reserves the right to terminate the AAirpass Agreement and refund the Purchase Price of any AAirpass, less charges for mileage flow, and at a rate of $.24 per mile, except for Unlimited Mileage AAirpasses, which will be refunded in accordance with Paragraph 7, subparagraph (d)" of the AAirpass Agreement. Ex. C, Complaint, Exhibit A at Para. 17(c). Paragraph 12 of the AAirpass Agreement provides that "if American determines that an AAirpass has been fraudulently used; American reserves the right to revoke the AAirpass and all privileges associated with it." Ex. C, Complaint, Exhibit A, Paragraph 12.**

27. American Airlines' decision to terminate Rothstein's Unlimited Mileage Lifetime AAirpass for fraudulent use was based entirely on the incidents described in its counterclaim and nothing else. (*Cade Deposition* Exhibit "C" p. 13: lines 2-12).

**ANSWER: American denies that the decision to terminate Mr. Rothstein's AAirpass was based solely upon the allegations of fraud contained in its counterclaim and nothing else. American reserved the right to terminate the AAirpass without offering a refund after 200 months. Ex. A, Challender Dep. p. 36:20-25, 37:1-5.**

28. American Airlines contends that it has the right to terminate. Rothstein's Unlimited Mileage Lifetime AAirpass for any conduct *deemed* fraudulent by American Airlines. For example, Rothstein reserved a round trip first class flight between Chicago O'Hare and London Heathrow airports with Arthur Reynolds as his AAirpass traveling companion (*Reynolds Declaration*) This was, according to American, a fraudulent use justifying forfeiture of all of Rothstein's AAirpass privileges, without refund, even though Reynolds actually accompanied Rothstein on the reserved round-trip flights!! (*Reynolds Declaration*; *Cade Deposition* Exhibit "C" p. 96: 6-17; *Cade Deposition* Exhibit "C" Vol. 2 p. 10:19-25, p. 13:7-25, p. 14: 1-25, p. 42: 4-25, p. 48: 17-25, p. 49:1-11) According to American Airlines, Rothstein must have known that

Reynolds had a conflicting American Airlines reservation (which he did not use) from Chicago to New York which Reynolds failed to cancel, taking the free first class trip to London instead. (Reynolds actually accompanied Rothstein on the flights to London and Chicago) [*Cade Deposition* Exhibit "C" pp. 53: 16-24; p. 97: 8-20; *Reynolds Declaration*].

**ANSWER: American denies that the decision to terminate Mr. Rothstein's AAirpass was based solely upon the allegations of fraud contained in its counterclaim and nothing else. American reserved the right to terminate the AAirpass without offering a refund after 200 months. Ex. A, Challender Dep. p. 36:20-25, 37:1-5.**

29.     Rothstein's fraud, according to American, occurred when Rothstein failed to *cancel* reservations before the flights.  (*Challender Deposition* Exhibit "A" pp. 62: 17-25; 63: 1-20; *Cade Deposition* Exhibit "C" p. 97:8-20).

**ANSWER: American denies the allegations of Paragraph 29. Mr. Challender testified that a customer that made two reservations for separate flights commits fraud if he or she does not cancel one prior to taking the trip. (Ex. A, Challendar Dep., p. 6:5-13.) The "issue is making multiple bookings that cannot be completed by the same person. (Ex. A, Challender Dep., p. 63:14-20.) Ms. Cade testified that failure to inform American of a no show in advance was fraud if "he knew he was not going to travel". Ex. F, Cade Dep., Vol.1, p. 97:3-7.**

30.     There is nothing in the AAirpass Agreement or in the "Conditions of Carriage" of American Airlines which notified Rothstein that "speculative reservations" were prohibited. (*Thurmond Declaration* ¶¶12,13; *Challender Deposition* Exhibit "A"  pp. 72-73;  *Cade Deposition* Exhibit "C" Vol. 2, pp. 19-23).

**ANSWER: American admits that there is no language in the AAirpass Agreement or Conditions of Carriage specifically addressing the prohibition of making speculative reservations.**

31.     The "fraudulent usage" provision in paragraph 12 of the AAirpass Agreement was intended by American to reserve the right to declare a forfeiture/penalty only if the holder actually committed fraud in connection with use of the AAirpass . (*Thurmond Declaration*, ¶¶ 14, 17; Exhibit 3, ¶12).

**ANSWER: American denies the allegations of Paragraph 31. The intention of American and Rothstein is clearly embodied in the plain language of Paragraph 12 of the AAirpass Agreement, which allows *American* "to revoke the AAirpass and all privileges associated**

12

**with it," if** *American* **"determines that an AAirpass has been fraudulently used." Ex. C Complaint, Exhibit A, Paragraph 12.**

32.    There is nothing in the AAirpass Agreement or in American Airlines' Conditions of Carriage which requires an American Airlines customer to notify American Airlines of a no-show in advance of the flight.  (Exhibit 3; *Challender Deposition* Exhibit "A" p. 71: 9-25, p. 72; *Thurmond Declaration*, ¶13).

**ANSWER:    American admits that the AAirpass agreement and Conditions of Carriage did not include language requiring an American Airlines customer to "notify American Airlines of a no show in advance of a flight."**

33.    American Airlines employees published an article in 1992 (before change fees were implemented) reporting that more than 30% of all American Airlines' reservations were either cancelled or no shows.  (*Soter Declaration* ¶4; Exhibit   29).

**ANSWER:    There is no evidentiary basis for the facts alleged in Paragraph 33 other than the declaration of the Plaintiff's counsel, Gary Soter.  American therefore denies the allegations of paragraph 33.**

34.    Rothstein hoped and intended to bring his designated companions on the flights reserved for those companions.  Rothstein never intended to deceive anyone at American Airlines (*Rothstein Declaration*, ¶9; *Johnson Deposition* Exhibit "B" p. 38: 9-21).  (Relevant deposition transcript excerpts of Nancy Rothstein Exhibit "E" p. 37;  *Lauren Matasar Deposition* Exhibit "F" pp. 11,12,13,14,18,21,22;  *Daniel Cummings Deposition* Exhibit "G" pp. 21: 14-22, 22: 5-24, 23: 1-19, 24: 1-13, 30: 7-13, 32: 3-7;   *Samir Patel Deposition* Exhibit "H" pp. 10,14,15,17,18,19,26,27,28; *Jeffrey Rothstein Deposition* Exhibit "I" pp.16,17,18,19,20; *Kenneth Rothstein Deposition* Exhibit "J" pp. 11,12,19,20,21,22,37,41; *Jacob Wonsover Deposition* Exhibit "K" pp. 10,14,15, 16,17 ,18, 20, 21, 22; Steven *Rothstein Declaration*; *Arthur Reynolds Declaration*; *James Fairbrother Declaration*).

**ANSWER:    American admits that Rothstein claims to have hoped and intended to bring his designated companions reserved for those flights.  American admits that Rothstein claims he never intended to deceive anyone.  American believes that Mr. Rothstein intended to deceive American Airlines.  Ex. F, Cade Dep. Vol. I, p. 78:18-25, 79:1-9.**

**FACTS REVEALED DURING DISCOVERY RELATING TO INTENDED MEANING OF PARAGRAPH 17(c)**

13

35.     The American Airlines representative who sold the AAirpass to Rothstein told Rothstein that he would be *entitled* to Unlimited Mileage AAirpass privileges for the remainder of his life unless Rothstein fraudulently used the pass and that he was entitled to reserve two seats – one for himself and one for a companion. (Ernest *Thurmond Declaration*, ¶¶10,11; *Challender Deposition* Exhibit "A" p. 43: 6-14, p. 129, p. 142: 8-20).

**ANSWER:     American admits that Mr. Thurmond signed a declaration on behalf of Rothstein that included facts described in Paragraph 35. American denies that the AAirpass Agreement could be terminated *only* in the event of fraudulent use. The AAirpass Agreement authorized American to terminate the agreement if (1) under the Rider to Paragraph 19 if Rothstein did not pay the purchase price (Ex. K, 12 Rothstein Dep., p. 24:6-24; 25:1-11); (2) under Paragraph 17(b) if the government promulgated rules or regulations pertaining to the agreement (Ex. K, S. Rothstein Dep., p. 56:18-24; 57:1-24; 58:1-21); (3) under paragraph 12 "American determines that an AAirpass has been fraudulently used, American reserves the right to revoke the AAirpass and all privileges associated with it." (Ex. C, Complaint, Exhibit A, Paragraph 12); and (4) under Paragraph 17(c), American "reserves the right to terminate the AAirpass Agreement and refund the Purchase Price of any AAirpass, less charges for mileage flown, and at a rate of $.24 per mile, except for Unlimited Mileage AAirpasses, which will be refunded in accordance with Paragraph 7, subparagraph (d)" of the AAirpass Agreement. (Ex. C, Complaint, Exhibit A at Para. 17(c).**

36.     American Airlines sales representatives and the President of American Airlines told Rothstein that his purchase of the Unlimited Mileage Lifetime AAirpass was in the nature of an "investment" which was likely to increase in value over time due to increased ticket costs and expanded American Airlines travel destinations.     (*Thurmond Declaration*, ¶15; *Rothstein Declaration*, ¶2; Exhibit 12).

**ANSWER:     American admits that Mr. Thurmond signed a declaration Mr. Thurmond signed a declaration on behalf of Rothstein that included facts described in Paragraph 36. American denies that the AAirpass was an "investment." The AAirpass Agreement was a contract for services. (Ex. C, Complaint, Ex. A.)**

37.     American Airlines is bound to comply with the verbal representations of Ernest Thurmond to the extent that they are not overridden by the contract language. (*Challender Deposition* Exhibit "A" p. 143: 18-20).

**ANSWER:     American denies that it is bound by Mr. Thurmond's verbal representations. American admits that Mr. Thurmond signed a declaration on behalf of Rothstein that included facts described in Paragraph 35. American denies that the AAirpass Agreement could be terminated *only* in the even of fraudulent use. The AAirpass Agreement authorized American to terminate the agreement if (1) under the Rider to Paragraph 19 if**

Rothstein did not pay the purchase price (Ex. K, S. Rothstein Dep., p. 24:6-24; 25:1-11); (2) under Paragraph 17(b) if the government promulgated rules or regulations pertaining to the agreement (Ex. K, S. Rothstein Dep., p. 56:18-24; 57:1-24; 58:1-21); (3) under paragraph 12 "American determines that an AAirpass has been fraudulently used, American reserves the right to revoke the AAirpass and all privileges associated with it." (Ex. C, Complaint, Exhibit A, Paragraph 12); and (4) under Paragraph 17(c), American "reserves the right to terminate the AAirpass Agreement and refund the Purchase Price of any AAirpass, less charges for mileage flown, and at a rate of $.24 per mile, except for Unlimited Mileage AAirpasses, which will be refunded in accordance with Paragraph 7, subparagraph (d)" of the AAirpass Agreement. (Ex. C, Complaint, Exhibit A, Para. 17(c).

38.     The Unlimited Mileage Lifetime AAirpass was priced based on the life expectancy of the purchaser, not the 200 month period for providing pro-rata refunds pursuant to a holder's request as set forth in paragraph 7 of the AAirpass Agreement. (*Challender Deposition* Exhibit "A" p. 45: 21-25, p. 46:1-6).

**ANSWER:   American denies the conclusory allegations of Paragraph 38.   American admits that Mr. Challender "personally" agreed that when American determined the price for Rothstein's AAirpasses, American factored Rothstein's life expectancy into the price. He further testified that he would assume that Rothstein would use the AAirpass for the remainder of his life.  Ex. A, Challender Dep., p. 45:21-25; 46:1-6.**

39.      An Unlimited Mileage Lifetime AAirpass holder is "entitled" to  continuing AAirpass privileges for the remainder of his or her life and American did not intend to reserve the right to end those entitlements after 200 months (as alleged in the American Airlines counterclaim) [*Challender Deposition* Exhibit "A" p. 48: 2-6; *Thurmond Declaration* ¶¶ 14,  15, 16].

**ANSWER:   American admits that an AAirpass holder is entitled to the benefits set forth in the AAirpass Agreement. (Ex. C, Complaint, Exhibit A.)  American denies that "it did not intend to reserve the right to end those entitlements after 200 months.   Paragraph 17(c) of the AAirpass Agreement provides that American "reserves the right to terminate the AAirpass Agreement and refund the Purchase Price of any AAirpass, less charges for mileage flow, and at a rate of $.24 per mile, except for Unlimited Mileage AAirpasses, which will be refunded in accordance with Paragraph 7, subparagraph (d)" of the AAirpass Agreement.  There is nothing in Paragraph 17(c) that places any time restrictions on American's right to terminate the agreement.   The language requires, however, American to issue a refund pursuant to the formula set forth in Paragraph 7 of the Agreement.  Ex. C, Complaint, Exhibit A at Para. 17(c).**

40. Approximately 60 of the 66 persons who purchased Unlimited Lifetime AAirpasses on American Airlines are still alive and are receiving AAirpass privileges as a contractual entitlement and not as a gift even though all of the AAirpasses are more than 200 months old. (*Challender Deposition* Exhibit "A" pp. 40, 45-48).

**ANSWER:** **Defendant admits the allegations of Paragraph 40.**

41. In the more than 20 years that Rothstein used his AAirpass, American never considered paragraph 17(c) as a potential basis for termination of Rothstein's entitlements to AAirpass privileges before terminating Rothstein's AAirpass by letter in December, 2008. (*Soter Declaration*, ¶6).

**ANSWER:** **American denies the allegations of Paragraph 41. American investigated terminating Rothstein's AAirpass in April 2004 based upon the termination language at paragraph 17(c). Further, American calculated the amount of refund that Mr. Rothstein would be paid had American elected to terminate the AAirpass on those grounds. Exhibit B. Affidavit of Elisabeth Welch at paras. 6-9.**

42. American Airlines intended to reserve the right to terminate the AAirpass Agreement pursuant to paragraph 17(c) *only* if one of the events described in Paragraph 17(b) occurred. (*Thurmond Declaration*, ¶14; Exhibit 3, pp. 00006, 00007, 00021 at ¶ H(1)(2).

**ANSWER:** **American denies the allegations of Paragraph 42. The AAirpass Agreement authorized American to terminate the agreement if (1) under the Rider to Paragraph 19 if Rothstein did not pay the purchase price (Ex. K, S. Rothstein Dep., p. 24:6-24; 25:1-11); (2) under Paragraph 17(b) if the government promulgated rules or regulations pertaining to the agreement (Ex. K, S. Rothstein Dep., p. 56:18-24; 57:1-24; 58:1-21); (3) under paragraph 12 "American determines that an AAirpass has been fraudulently used, American reserves the right to revoke the AAirpass and all privileges associated with it." (Ex. C, Complaint, Exhibit A, Para. 17(c); and (4) under Paragraph 17(c), American "reserves the right to terminate the AAirpass Agreement and refund the Purchase Price of any AAirpass, less charges for mileage flown, and at a rate of $.24 per mile, except for Unlimited Mileage AAirpasses, which will be refunded in accordance with Paragraph 7, subparagraph (d)" of the AAirpass Agreement. (Ex. C, Complaint, Exhibit A, Para. 17(c).**

## AMERICAN TERMINATES ROTHSTEIN'S AAIRPASS AND SUES HIM FOR DAMAGES ON ITS COUNTERCLAIM

43. In December, 2008, American Airlines sent notice of termination of Rothstein's AAirpass based on the company's unilateral determination that Rothstein made "speculative

reservations" for his companions. (*Rothstein Declaration*, ¶11; *American Airlines Answer and Counterclaim at page 3 ¶ 6, Court Docket No. 25* )  American Airlines deems *every* "speculative reservation" (undefined and not prohibited by any contract, notice, tariff or Condition of Carriage assented to by Rothstein) as a fraudulent use of the AAirpass.  (*Cade Deposition* Exhibit "C" p. 105:17-19; *Rothstein Declaration*, ¶11).

**ANSWER:  American admits that it sent notice of the termination of Rothstein's AAirpass Agreement in December 2008.  American denies that termination was only based upon its determination that Rothstein had made speculative reservations.  American terminated the AAirpass Agreement based upon Sections 12 and 17(c) of the Agreement. (Ex. I, Affidavit of Bridget Cade, Para. 17.  American believes that "every speculative reservation is a fraudulent reservation."  Ex. F, Cade Dep., Vol. 1, p. 105:17-19.  Neither the testimony of Bridget Cade nor the paragraph of the Declaration of Steven Rothstein cited by Plaintiff includes any testimony that supports the allegation that a "speculative reservation" was "undefined and not prohibited by any contract, notice, tariff or Condition of Carriage assented to by Rothstein."  American therefore denies the allegation.  (Ex. F, Cade Dep., Vol. 1 at p. 105:17-19;  Ex. K, S. Rothstein Declaration of Para. 11.)**

44.    American Airlines' answer and counterclaim seeks a penalty/forfeiture equal to the entirety of Rothstein's $400,000 investment, a forfeiture of all AAirpass privileges, including forfeiture of miles in his AAdvantage account, cancellation of his and his wife's memberships in the Admirals Club (purchased *before* the Unlimited Lifetime AAirpass), plus compensatory damages equal to the value of all the "spoiled" tickets which American Airlines claims it was unable to sell to others in connection with Rothstein's *allegedly* speculative reservations. (See *American Airlines Answer and Counterclaim Docket Document No. 25*).

**ANSWER:  American denies that American's answer and counterclaim seeks a penalty/forfeiture of $400,000, a forfeiture of all AAirpass Privileges, including forfeiture of miles in Rothstein's AAirpass account, or cancellation of his and his wife's memberships in the Admiral's Club.   *See generally,* American's Answer and Counterclaim.  American admits that it has prayed for (A) Judgment in its favor and against Rothstein, and amount to be proven at trial; (B) an award of attorneys fees to American and (C) such other relief as the court deems appropriate and just.   *See generally,* American's Answer and Counterclaim.**

45.    Although American Airlines knows that "speculative reservations" are a common occurrence in the airline industry, American Airlines has never sued any customer for making

17

speculative reservations who did not hold an Unlimited Mileage Lifetime AAirpass. (*Challender Deposition* Exhibit "A" pp. 68-69).

**ANSWER: There is no evidentiary basis in the testimony cited by plaintiff to support the allegations contained in Paragraph 14. American therefore denies the same. When asked whether American had ever "sued any other customer for making a reservation and not showing up," Mr. Challender stated, "no, not for making a single reservation and not showing up." (Ex. A, Challender Dep., p. 68:19-23.) Mr. Challender testified that he "honestly [did not] have any idea" how often a First Class customer buys a ticket, and simply does not show up and does not notify American, but that he knew "that it does." He did not testify that it was a "common occurrence." Ex. A, Challender Dep., p. 69:2-6.**

46. *After* terminating Steven Rothstein's AAirpass, American Airlines published "Conditions of Carriage" over the internet, purporting to prohibit false, speculative, illogical or conflicting reservations. (*Thurmond Declaration* ¶12).

**ANSWER: American admits that its Conditions of Carriage prohibit false, speculative, illogical or conflicting reservations.**

## DEFENDANT AND COUNTER-PLAINTIFF AMERICAN AIRLINES' ADDITIONAL STATEMENTS OF MATERIAL FACTS IN RESPONSE TO PLAINTIFF AND COUNTER-DEFENDANT STEVEN ROTHSTEIN'S MOTION FOR SUMMARY JUDGMENT, PURUSANT TO LOCAL RULE 56.1(b)(3)

### AMERICAN'S RIGHT TO TERMINATE UNDER PARAGRAPH 17(c)

1. Mr. Rothstein acknowledged that Paragraph 17(c) allows American to terminate the contract at *any* time, and the 200-month provision is simply a marker for the calculation of a refund under the refund provision in ¶17(c). (Ex. D, Dep. of S. Rothstein, pp. 66:12 – 67:15).

2. American did not believe that it was required to establish good cause to termination Mr. Rothstein's AAirpass under ¶ 17(c). (Ex. A, Dep. of J. Challender, p. 117: 6-9).

### MATERIAL FACTS AS TO PLAINTIFF'S FRAUDULENT AAIRPASS USAGE

3. Over a period of years, American conducted a thorough investigation regarding Mr. Rothstein's AAirpass usage, which consisted of reviewing thousands of booking records for

18

Mr. Rothstein and his companions in order to determine whether he was using his AAirpass and companion feature fraudulently. (Ex. F, Cade Dep. Vol. 1. at p. 11:25,12:1-6; 61: 1-4; 62:4-18).

4.      American met with Plaintiff in 2004 to discuss his practice of fraudulently reserving empty seats, using the fictitious names of "Steven Rothstein, Jr." and "Bag Rothstein," which Mr. Rothstein admits to doing. (Ex. G, Welch Dep. at p. 10:10-20); (Ex. A, Challender Dep. at p.103:10-19); (Ex. D, S. Rothstein Dep. at p. 176:18-24, 177:1-16); (Ex. I, Cade Aff. at ¶ 8).

5.      American never intended that termination of an AAirpass, pursuant to ¶ 12, was only permitted where Mr. Rothstein's AAirpass was used by someone other than himself, as Mr. Rothstein contends. (Ex. D, S. Rothstein Dep. at pp. 42:1-5; 43:9-18).   American deemed fraudulent use, as used in ¶ 12, to include (1) using fictitious names to book empty seats; (2) booking speculative reservations that are canceled at the last minute or substituted with a random already-ticketed passenger at the airport; (3) making impossible or illogical reservations; and (4) failing to show up for a flight or canceling booked flights on the day of the flight. (Ex. H, Cade Dep., Vol. II, p. 16: 9-16); (Ex. A, Dep. of Challender, p. 83: 1-24, p. 84: 8-10).

6.      Mr. Rothstein made material misrepresentations to American when he made reservations for persons with whom he "expected to travel" but did not confirm whether the companion could travel with him, and later admitting that he was "frivolous" about traveling. (Ex. D, S. Rothstein Dep at p. 171: 7-17; 173:17-22;174:1-4).

7.      Plaintiff made material misrepresentations to American when he made reservations for several persons, holding them almost until the time of departure, and replacing the passengers with strangers he found at the gate. (Ex. D, S. Rothstein Dep., pp.132: 22-24;

19

133:1-15; 137:9-24; 138:1-8; 140:20-24; 142:3-22; 143:12-24; 144; 145;1-13; 153:17-24; 154-155; 156:1-15).

8. Mr. Rothstein's fraudulent activity further included making duplicative reservations for himself on at least three occasions in 2008. (Ex. H, Cade Dep., Vol. II, pp. 70:2-12; 94:6-25; 95:1-16; 99:3-15).

9. Moreover, Mr. Rothstein's action of making multiple reservations for passenger Daniel Cummings to travel between the United States and Europe at the same time that Mr. Cummings had his own plans to travel from Chicago to Paris evidence his misrepresentations to American. (Ex. F, Cade Dep., Vol. I, pp. 84:24-25, 85:1-22).

10. Plaintiff made reservations for his brother Kenneth Rothstein to travel with him from New York to Chicago, even though Kenneth Rothstein lived in Denver, Colorado and would not have been able to travel with Plaintiff at the time. (Ex. D, S. Rothstein Dep., pp. 138:23-24; 139:1-13).

Dated: December 17, 2010                Respectfully submitted,

                                        **AMERICAN AIRLINES, INC.**


                                        /s/  Mark S. Susina
                                        One of the Attorneys for Defendant
                                        AMERICAN AIRLINES, INC.


Michael G. McQuillen (Atty. No. 6188166)
Mark S. Susina (Atty. No. 6201998)
Austin W. Bartlett (Atty. No. 6273427)
**ADLER MURPHY & McQUILLEN LLP**
One North LaSalle Street
Suite 2300
Chicago, Illinois 60602
(312) 345-0700

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on December 17, 2010, I caused the foregoing **ANSWERS TO PLAINTIFF AND COUNTER-DEFENDANT STEVEN ROTHSTEIN'S LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE, AND STATEMENT OF ADDITIONAL FACTS** to be filed with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system which sent notification of such filing to counsel of record who are all CM/ECF participants

By:/s/    Mark S. Susina
Michael G. McQuillen (Atty. No. 6188166)
Mark S. Susina (Atty. No. 6201998)
Austin W. Bartlett (Atty. No. 6273427)
**ADLER MURPHY & McQUILLEN LLP**
One North LaSalle Street
Suite 2300
Chicago, Illinois 60602
(312) 345-0700

*Attorneys for Defendant, American Airlines*

21