# EXHIBIT "33"

**BRIDGET CADE - June 07, 2010**

1   A.   Yes.  That we determined at that point, yes.
2   Q.   Has American Airlines determined that there
3 were other incidents that were not mentioned in the
4 counterclaim that constitute a fraudulent use of the
5 AAirpass?
6   A.   Not specifically at this point.
7   Q.   So it's those incidents that are described in
8 the counterclaim that form the basis of the finding of
9 fraud.
10  A.   That's correct.
11  Q.   And none others.
12  A.   That's correct.
13  Q.   All right.  Now, you recognize that the
14 answers you give today can be read to the jury at the
15 time of trial, and that it's important for you to give
16 the truth, the whole truth, and nothing but the truth?
17  A.   Yes.
18  Q.   You're going to endeavor to do that.
19  A.   Yes.
20  Q.   Even if the answers are not helpful to
21 American Airlines' position in the case, correct?
22  A.   Yes.
23  Q.   And you'll have an opportunity to review your
24 deposition booklet and make corrections or changes at
25 that time.  You'll be given an opportunity to then sign

**BRIDGET CADE - June 07, 2010**

1     A.   He had had a discussion with American Airlines before for making bookings for people who did not intend to travel prior to my investigation per his file.

5     Q.   (BY MR. SOTER) Thank you. You've misread the letter, and you've misread the communication between Lisa -- are you talking about Lisa Welch?

8     A.   I'm talking about the -- the -- the bookings that he made for himself to travel with himself.

10     Q.   With an empty seat.

11     A.   Or for Steven Rothstein, Jr., that doesn't exist, correct?

13     Q.   Right. He was told he couldn't travel with an empty seat and he couldn't use Bag Rothstein or Steven Rothstein, Jr., that wasn't allowed, right?

16     A.   That's correct.

17     Q.   And after he was told that wasn't allowed, he said what about a course of conduct, doesn't that make a difference? American Airlines agreed to investigate, and he agreed, until the issue was resolved, not to reserve an empty seat anymore even though he had done it for years, right?

23     MR. SUSINA: Objection, form.

24     Go ahead.

25     Q.   (BY MR. SOTER) All of that is true.

BRIDGET CADE - June 07, 2010

1     A.    I believe so, yes.

2     Q.    And then after he was told in March 2004, the
3 one and only letter that was sent to him by American
4 Airlines, that he would no longer be able to reserve an
5 empty seat in the name of Bag Rothstein or some other
6 fictitious name, he ceased doing that, didn't he?

7     A.    He began making reservations for people who
8 did not intend to travel.

9     Q.    That was your conclusion.

10     A.    That was my conclusion from my investigation,
11 correct, after -- after 2004.

12     Q.    A conclusion -- right. A conclusion based
13 on -- you reviewed hundreds or thousands of travel
14 records, you identified 15 different reservations that
15 you claim -- or American Airlines claim was a
16 fraudulent use of the AAirpass out of those thousands
17 of traveled, and each of those involved either a --
18 what you call a duplicate booking where it was
19 impossible to make both reservations --

20     A.    Correct.

21     Q.    -- or reservation for a companion who you say
22 that Mr. Rothstein did not really intend to bring with
23 him.

24     A.    Correct.

25     Q.    Every one of those reservations falls into

**BRIDGET CADE - June 07, 2010**

1           Go ahead.
2      A.   The no-show rate is very low.
3      Q.   (BY MR. SOTER)  What is the no-show rate?
4      A.   I don't -- I can't give it to you exactly,
5  but it is low.
6      Q.   Well, you say very low.  I don't have any
7  idea what you mean.  Is that 2 percent, 10 percent, 20
8  percent?
9      A.   I can't give you the exact rate.  If I -- if
10 I try to come up with a number, it'll be incorrect.  It
11 -- it's very low.
12     Q.   What makes you say it's low?  That -- low is
13 a relative term.
14     A.   Because we strive very -- very diligently to
15 avoid no-shows because it costs us money.
16     Q.   Of course it costs you money, but I want to
17 know what the -- what the no-show rate is.
18     A.   I -- I don't know that off the top of my
19 head.  I would have to find that for you.
20     Q.   Are -- are there statistics that are
21 maintained, reports that you've seen?
22     A.   Absolutely.
23     Q.   And is this published data that -- that a --
24 that I can find on the web?
25     A.   Probably not, but I can get -- I can get the

```
 1      A.    Absolutely.
 2      Q.    Let me ask you about -- if you turn to
 3   page 9, paragraph 26 through 29, let in ask you --
 4   let me first ask you who Lauren Matasar is?
 5      A.    Laurie is my sister-in-law.
 6      Q.    Is she married to Kenneth?
 7      A.    No, she's married to --
 8      Q.    I'm sorry.  I take that back.
 9      A.    -- David Matasar.
10      Q.    Okay.  Is this your wife's --
11      A.    My wife's younger sister.
12      Q.    Your wife's younger sister.  Okay.
13      A.    Exactly.
14      Q.    Where does Ms. Matasar live?
15      A.    They live in Homewood-Flossmoor.
16      Q.    Did you travel often with Ms. Matasar?
17      A.    Yes.
18      Q.    Okay.  Approximately how many times in the
19   five years prior to termination did you travel with
20   Ms. Matasar as a -- let me qualify that by saying as
21   a companion traveling with you under your AAirpass?
22      A.    I can't answer whether she was a companion
23   on AAirpass or whether she was on another ticket, but
24   I could answer approximately how many times we've
```

```
 1    been out of town together to various places.
 2        Q.    If you were traveling with Ms. Matasar,
 3    would it be on a personal matter as opposed to a
 4    business matter?
 5        A.    Absolutely.
 6        Q.    And approximately how many times did you
 7    travel with her in the five years preceding
 8    termination?
 9        A.    Fifteen.
10        Q.    And on each of those -- I think you said
11    you were unable to know whether she was traveling as
12    your AAirpass companion, is that correct?
13        A.    Yes.
14        Q.    Okay.  Would she be traveling perhaps on
15    AAdvantage miles, as well, of yours?
16        A.    Or on a paid ticket.
17        Q.    Or on a ticket that was bought?
18        A.    Yes.
19        Q.    Either by her or someone else?
20        A.    Most likely by her or her husband.
21        Q.    Okay.  Have you reviewed the allegations
22    set forth in paragraphs 26 through 29 of American's
23    counterclaim?
24        A.    I have.
```

```
 1        A.   It certainly is not out of the realm of
 2   possibility, yes.
 3        Q.   You knew he flew more than 300 times a year?
 4        A.   I did not know that specifically.
 5        Q.   Do you know what the conditions of carriage
 6   are?
 7        A.   I'm moderately familiar with the conditions
 8   of carriage.
 9        Q.   Is there anything in the conditions of
10   carriage that requires an American Airlines customer to
11   notify American Airlines of a no-show in advance?
12        A.   No.
13        Q.   Isn't it a frequent occurrence that customers
14   will simply not show?
15        A.   I don't know how you define frequent.  I know
16   that it happens.
17        Q.   Doesn't American Airlines -- by the way,
18   what's a speculative reservation?
19        A.   One that's made in anticipation of a trip
20   that as evidenced by a -- well, a duplicate -- I want
21   to be careful about how I describe this.
22                  Contemporaneous reservations that are
23   clearly not able to be traveled by one person, we use
24   the term speculative to describe them, because they're
25   speculative in nature, it is undetermined, and the
```

of seats. American offered cheaper fares to stimulate demand in a controlled manner on low demand flights while maintaining higher profits on popular flights by limiting the number of super-saver fares offered. Allowing the sale of too many discount fares causes the displacement of higher-revenue passengers, while allowing too few discount sales results in empty seats on the plane. In 1982, Decision Technologies developed an optimization model based on Littlewood's research [1972] to determine the appropriate number of reservations to allocate to each fare type.

Airline deregulation in 1979 led to additional complexity in the practice of yield management. Two major changes took place. First, the number and variety of discount fares increased. Second, airlines began offering connecting service, using centrally located airports as hubs, to serve more of the traveling public and provide national service. For example, a single American Airlines flight from Dallas/Fort Worth to Denver may serve passengers from over 40 different eastern cities who are connecting to the Denver flight. The resulting airline environment is very complex. Many different passenger itineraries are possible, all with many different fares. Also, prices change rapidly, with up to 50,000 fare changes made daily.

American Airlines has developed operations research techniques to address yield management problems in five major areas:
— Overbooking,
— Discount allocation,
— Traffic management,
— Modeling passenger preferences, and
— Determining yield management performance.

**Overbooking**

Airlines allow customers to cancel unpaid reservations with no penalty. Even after purchasing a ticket, many passengers may cancel or miss their flights and receive at least partial refunds. (A passenger who does not formally cancel a reservation and does not show-up for the flight is considered a no-show.) On average, about half of all reservations made for a flight are cancelled or become no-shows. American estimates that about 15 percent of seats on sold-out flights would be unused if reservation sales were limited to aircraft capacity.

By properly setting reservation levels higher than seating capacity, American is able to compensate for passenger cancellations and no-shows, resulting in greater seat utilization. Poor overbooking decision-making can be costly. If reservation levels are set too low (more passengers cancel or no-show than expected), then flights depart with empty seats that could have been filled by turned-away demand. Empty seats on sold-out flights are called spoiled because once a flight departs, an empty seat has no economic value. Spoilage therefore represents a lost-opportunity cost to the airline. Figure 1 shows an example of a typical reservations pattern with and without overbooking.

While overbooking generates additional revenue for the airline (because fewer

> Their inability to control availability of discount seats contributed to the demise of several carriers.