IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| STEVEN ROTHSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 C 2770 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In the late 1980s, Plaintiff Steven Rothstein ("Rothstein") bought an "AAirpass" from American Airlines, Inc. ("American") that allowed him and a companion unlimited first-class travel for the rest of his life. American terminated Rothstein's AAirpass in 2008 asserting that Rothstein had used it fraudulently, including by booking companion seats under fictitious names so that he could sit next to an empty seat and by making "speculative" reservations for travel companions who did not intend to travel with him. Rothstein counters that American countenanced his booking practices. Both parties have moved for summary judgment on Rothstein's breach of contract claim, and Rothstein has moved for summary judgment on American's counterclaims for fraud, breach of contract and tortious interference with business expectancy. For the below reasons, the Court grant's American's motion and denies Rothstein's motion.

I.     **MATERIAL UNDISPUTED FACTS**

    A.     **AAirpass Agreement**

In 1987, Rothstein, a financier, paid $250,000 to American and signed a contract for a single AAirpass giving him unlimited first class travel for the rest of his life. (Doc. 74, Rothstein 56.1

Resp. ¶¶ 5, 19; Doc. 69, American 56.1 Resp. ¶ 3.) He spent $150,000 two years later to add a "companion feature" to his original AAirpass. (Rothstein 56.1 Resp. ¶ 6.) That companion feature allowed him "to make a reservation for and travel on the AAirpass with one . . . companion per flight." (*Id.*) Before signing the AAirpass agreement, Rothstein negotiated its terms and asked American "dozens and dozens of questions." (*Id.* ¶ 20.) American included two terms in the contract that Rothstein requested, including one that allowed Rothstein's wife to travel as his "companion" under the AAirpass if she took the flight immediately before or after Rothstein's. (American 56.1 Resp. ¶ 6 citing Rothstein Dep. 60.) Rothstein made extensive use of his AAirpass for more than 20 years, becoming one of American's most frequent flyers. (Rothstein 56.1 Resp. ¶ 8.)

According to the AAirpass agreement, Rothstein could reserve one seat (or two seats, if traveling with a companion) for any American flight, subject to American's rules tariff in place at the time of travel. (*Id.* ¶ 7.) Paragraph 12 of the agreement states:

> FRAUDULENT USAGE. If American determines that an AAirpass has been fraudulently used, American reserves the right to revoke the AAirpass and all privileges associated with it. Holder will thereupon forfeit all rights to the AAirpass, without refund, and will return the AAirpass card and this Agreement shall terminate.

(*Id.* ¶ 24.) The agreement also has an integration clause that states "[t]his Agreement supersedes all prior communications or agreement between the parties regarding AAirpass." (*See* Doc. 69-3, AAirpass Agreement, ¶ 17(a).) The agreement may only be modified in a writing signed by both parties. (*Id.*)

### B. Rothstein's Fraudulent Use of the AAirpass

At his deposition, Rothstein admitted that he reserved companion seats on his AAirpass using

fictitious names like "Steven Rothstein, Jr." or "Bag Rothstein." (*Id.* ¶ 26.) He used "Steven Rothstein, Jr." to reserve companion seats at least 41 times between December 2003 and April 2004. (*Id.* ¶ 27.)[1] In April 2004, American warned Rothstein that he was not entitled to book an empty seat under the terms of his AAirpass. (*Id.* ¶ 28.) After that, Rothstein stopped reserving seats under the name "Steven Rothstein, Jr." (American 56.1 Resp. ¶ 13.) In December 2008, American sent Rothstein a notice explaining that it terminated Rothstein's AAirpass. (Rothstein 56.1 Resp. ¶ 43.)

### C. Additional Facts Deemed Admitted

As part of its response to Rothstein's Local Rule 56.1 statement of material undisputed facts, American provided a set of additional facts supporting denial of Rothstein's motion for summary judgment, as permitted by Local Rule 56.1(b)(3)(C). (*See* Doc. 69.) Rothstein did not file a statement responding to these additional facts, and they are deemed admitted under Local Rule 56.1. *See* L.R. 56.1(a) ("If additional material facts are submitted by the opposing party pursuant to section (b), the moving party may submit a concise reply in the form prescribed in that section for a response. All material facts set forth in the statement filed pursuant to section (b)(3)(C) *will be deemed admitted* unless controverted by the statement of the moving party.") (emphasis added); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (finding "[b]ecause of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance

---

[1] Rothstein filed a separate motion seeking to strike the affidavit of American employee Bridget Cade (Doc. 73), which supports American's Local Rule 56.1 statement that Rothstein used "Steven Rothstein, Jr." to book companion seats 41 times. Rothstein asserts that this fact is hearsay and without foundation. Cade's affidavit, however, is properly based on her personal knowledge and meets all the requirements of Rule 56(e)(1). Further, the affidavit is based on Rothstein's flight records that were produced in discovery (*see* Doc. 61, Soter Dec. ¶ 5) and admissible into evidence as records kept in the regular course of business. *See* F.R.E. 803(6).

with those rules.").[2]

The following additional facts are deemed admitted. Over a period of years, American conducted a thorough investigation into whether Rothstein used his AAirpass fraudulently, including reviewing Rothstein's and his companions' booking records. (Doc. 69, American Add'l Facts ¶ 3.) In 2004, American met with Rothstein to address his practice of fraudulently booking adjoining empty seats using fictitious names like "Steven Rothstein, Jr." and "Bag Rothstein." (*Id.* ¶ 4.) American never intended that fraudulent use under paragraph 12 would only encompass AAirpass use by someone other than Rothstein. (*Id.* ¶ 5.) American deemed fraudulent use to include (1) using fictitious names to book empty seats; (2) booking speculative reservations[3] that were either canceled at the last minute or substituted with a random, already-ticketed passenger at the airport; (3) making impossible or illogical reservations; and (4) failing to show up for a flight or canceling booked flights on the same day of the flight. (*Id.* ¶ 6.) Rothstein made misrepresentations to American when he made "speculative" reservations for companions without confirming the companion could travel with him, replacing companion reservations with strangers he found at the gate, and making duplicate reservations for himself. (*Id.* ¶¶ 6-8.) Rothstein also made reservations for Daniel Cummings when Cummings had his own travel plans and for Rothstein's brother when

---

[2] Had American's additional facts been the exact facts Rothstein responded to as part of the briefing on American's cross-motion for summary judgment, the Court may have excused Rothstein's failure to respond to the additional facts and applied those other responses to the additional facts. *See American Safety Cas. Ins. Co. v. City of Waukegan*, --- F.Supp.2d ----, 2011 WL 830763, at *17 n.6 (N.D. Ill. Mar. 3, 2011) (Kendall, J.) (choosing to only deem admitted those facts not responded to on the opposing party's cross motion). However, American's additional facts are different than the facts it used for its own summary judgment motion. (*Compare* Doc. 69 at pp. 18-20 *to* Doc. 74.) The Court expressly declines to try to divine how Rothstein would have answered American's additional facts based on his answers to different facts.

[3] American admits there was no language in the AAirpass agreement or "Conditions of Carriage" that addresses these "speculative" reservations or requires the AAirpass holder to tell American about a "no-show" in advance of a flight. (American 56.1 Resp. ¶¶ 30-32.)

4

he could not travel with Rothstein. (*Id.* ¶¶ 9-10.)

## II. CHOICE OF LAW AND STANDARD

The parties agree that the AAirpass agreement is governed by Texas law, and the Court will apply Texas law. (*See* Rothstein 56.1 Resp. ¶ 9); *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (internal citation and quotation marks omitted).

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## III. DISCUSSION

Under paragraph 12 of the contract, American could terminate Rothstein's AAirpass if he used it in a way American considered fraudulent.[4] There is no dispute that American considered Rothstein's fictitious and speculative booking records to be fraudulent use of the AAirpass. Rothstein offers three reasons why the Court should not enforce paragraph 12 as written: (1) it is an unenforceable penalty under Texas law; (2) it is unconscionable or illusory; and (3) under the rule of "practical construction," American allowed Rothstein to make the supposedly fraudulent bookings, so they cannot be fraudulent. The Court addresses each in turn.[5]

### A.   Paragraph 12 Is Not an Unenforceable Penalty

According to Rothstein, paragraph 12 is an "attempt to punish the AAirpass holder for any conduct deemed fraudulent by American" because American can revoke it without refund for fraudulent use. Such a provision is an unenforceable penalty under Texas law, claims Rothstein, because it does not meet the requirements for an enforceable liquidated damages clause. *See BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 766 (Tex. 2005) (finding a liquidated damages clause is not a penalty and enforceable when it is a reasonable estimate of damages, and the damages are incapable of precise calculation.) Put simply, the part of paragraph 12 at issue—that American may terminate the AAirpass for fraudulent use—is a termination clause, not a liquidated damages clause. Rothstein is really taking issue with the "no refund" term of paragraph 12. The question currently

---

[4] Because the Court finds American could terminate Rothstein's AAirpass under paragraph 12, the Court does not consider whether American could terminate the AAirpass under paragraph 17.

[5] Rothstein also suggests that American should only be allowed to claim that the 15 flights it identified in its interrogatory responses were fraudulent. For the purposes of this opinion, that argument is beside the point. As discussed below, the Court's finding that American could terminate Rothstein's AAirpass for "fraudulent use" is based on Rothstein's admissions that he made bookings using fake names to reserve empty seats using his companion feature.

before the Court is whether American may terminate the AAirpass for fraudulent use under the agreement. That is a different question than what damages American is entitled to when Rothstein uses the AAirpass fraudulently or what refund Rothstein would be entitled to once American terminated the AAirpass under paragraph 12. In other words, even if the Court agreed with Rothstein and refused to enforce the refund clause of paragraph 12, that does not change the term of the contract allowing American to terminate the AAirpass for fraudulent use. The part of paragraph 12 at issue here is not an unenforceable penalty.

### B. Paragraph 12 Is Not Unconscionable or Illusory

Rothstein asserts that paragraph 12 is so one-sided that it is unconscionable. Specifically, Rothstein asserts that he should not lose his AAirpass because American is the "judge, jury and executioner" when it comes to deciding what is fraudulent under the agreement, and American could take away the AAirpass in bad faith. Rothstein also cites the declaration of the American sales agent who sold the AAirpass to Rothstein, which states that the agent told Rothstein that American only considered fraudulent use to be someone else using Rothstein's AAirpass. (*See* Doc. 60, Thurmond Dec. ¶ 17.) Under Texas law, "[u]nconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided." *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). "Adhesion contracts are not per se unconscionable or void." *In re Lyon Fin. Servs.*, 257 S.W.3d 228, 233 (Tex. 2008).

Though paragraph 12 is one-sided and American may have had more bargaining power than Rothstein, it is not grossly one-sided or oppressive to Rothstein. American did not spring this term on an unwitting and unsophisticated customer, or bury it in fine print. Rothstein was an experienced

7

businessman when he signed the contract and given the amount of money involved, he weighed carefully his investment in American's future viability. (See Doc. 63, Rothstein Dec. ¶ 2; Rothstein Dep. 45.) Rothstein clearly had some measure of bargaining power: he successfully negotiated changes to the rules for companion flights to allow his wife to travel free as his "companion" if she was on the flight directly before or after him. Moreover, he specifically asked the AAirpass sales agent about what would constitute fraudulent use. (*Id.* at 42.) Rothstein could have insisted that any accusation of fraudulent use be submitted to an independent arbitrator. He could have insisted that American insert into the contract the sales agent's representations regarding what would, and would not, constitute fraudulent activity under paragraph 12. However, none of the agents' representations made it into the contract and they cannot be considered now because the agreement is fully integrated.

Rothstein's suggestion that the clause allows American to pull the AAirpass in bad faith or leaves him at the whim of American is also unpersuasive. Texas law upholds contracts that give such discretion to one party. *See Macy v. Waste Mgt., Inc.*, 294 S.W.3d 638, 646 (Tex. App. Ct. 2009) (upholding a contract that gave an employer the sole discretion as to whether termination was for cause or not). Rothstein was not without protection, however. Given that American has exclusive control over the decision of what is fraudulent use of the AAirpass, Texas law places a duty of good faith on American where American holds the discretion to terminate the agreement. *See Seale v. Am. Motorist Ins. Co.*, 798 S.W.2d 382, 390 (Tex. App. 1990) (holding "accompanying every contract is a duty to perform with care, skill, and reasonable expedience and faithfulness the thing agreed to be done."); *Blackmon-Dunda v. Mary Kay, Inc.*, No. 05-08-192, 2009 WL 866214, at *4 (Tex. App. Ct. Apr. 1, 2009) (noting that although Texas does not recognize a general good

faith duty in all contracts, an implied duty of good faith has been imposed "where there is unequal bargaining power between the parties and a risk exists that one of the parties may take advantage of the other based upon the imbalance of power.").

The undisputed facts show that American did not violate any duty of good faith when it terminated Rothstein's AAirpass. Even setting aside the facts deemed admitted and the parties' disagreement as to whether booking speculative or conflicting reservations should be or would be considered "fraudulent use" under paragraph 12, American did not breach the duty of good faith by considering fictitious companion reservations like "Bag Rothstein" to be fraudulent use. If Rothstein wanted two seats to himself on every flight, he should have paid another $250,000 to American for a second AAirpass, or negotiated an AAirpass that allowed him to book two seats whether occupied or not. However, he spent only $150,000 for the companion feature with more restrictions, most notably the requirement that he have a companion.[6]

### C. Rule of Practical Construction and Waiver

Next, Rothstein asserts the "rule of practical construction" and argues that the best evidence of what the parties meant by fraudulent use was the actions of the parties, and American's acquiescence in Rothstein's booking practices for 17 years demonstrates that the parties did not intend for any of these practices to be considered fraudulent. Rothstein's argument is unpersuasive for several reasons. First, the contract does not define fraudulent in a standalone way, inviting the

---

[6]Rothstein also suggests that "fraudulent use," as it appears in paragraph 12, should mean the same as "fraud" means under the law. In other words, according to Rothstein, it should only count as fraudulent use if American could prove a claim for fraud against Rothstein in connection with the AAirpass. Rothstein cites nothing that suggests that where a contract contains a word with both a legal and a common meaning, the Court must interpret it only with the legal meaning. Rather, the Court will "interpret the terms of the contract based on "the plain, ordinary and generally accepted meaning attributed to the term or word." *In re Green Tree Servicing LLC*, 275 S.W.3d 592, 598 (Tex. App. Ct. 2008).

Court to examine to the parties' course of dealing to see what the parties meant by the term. Rather, it defines fraudulent use in terms of what American determines fraudulent use to be. Rothstein's argument also explicitly assumes that paragraph 12 is ambiguous. The case cited by Rothstein, *Lone Star Gas Co. v. X-Ray Gas Co.*, 164 S.W.2d 504 (1942), concerned a contract requiring one party to deliver natural gas "in the usual conduct of its business." *Id.* at 549. The court looked to the parties' course of dealing to see what "usual conduct of its business" meant. *Id.* Here, Paragraph 12 is not ambiguous like the term in *Lone Star Gas*. Rothstein is really arguing that American waived its rights to enforce the paragraph or modified the contract by not cracking down on Rothstein sooner. But paragraph 17(d) of the AAirpass Agreement is clear: "American's failure to enforce any of its rights under this Agreement shall not constitute a waiver of such rights," and the agreement cannot be modified except in writing signed by both parties.

## IV. CONCLUSION

For the foregoing reasons, American's motion for summary judgment on Rothstein's breach of contract claim (Doc. 65) is granted. Rothstein's motion for summary judgment on his contract claim and American's counterclaims (Doc. 57) is denied. Rothstein's motion to strike the affidavit of Bridget Cade (Doc. 73) is denied. The parties shall appear on July 14, 2011 for a status hearing on what further proceedings, if any, are necessary on American's counterclaims and American's request for Rothstein's phone records (Doc. 48).

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 30, 2011

10